Filed 10/23/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| COUNTY OF LOS ANGELES et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> QUINN EMANUEL URQUHART & SULLIVAN, LLP, <br><br> Defendant and Appellant. | B331562 <br><br> Los Angeles County <br> Super. Ct. No. 21STCV42264 |
| QUINN EMANUEL URQUHART & SULLIVAN, LLP, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> COUNTY OF LOS ANGELES et al., <br><br> Defendants and Respondents. | B338936 <br><br> Los Angeles County <br> Super. Ct. No. 23STCV19134 |

CONSOLIDATED APPEALS from a judgment (No. B331562) and from an order of dismissal (No. B338936) of the Superior Court of Los Angeles County.  Holly J. Fujie and Jon R.

Takasugi, Judges.  Judgment affirmed and order of dismissal affirmed.

Quinn Emanuel Urquhart & Sullivan, Steven G. Madison, John P. D'Amato and Robert E. Allen for Defendant and Appellant (No. B331562) and Plaintiff and Appellant (No. B338936).

O'Melveny & Myers, James A. Bowman, Dimitri D. Portnoi, Kelsey A. Chandrasoma and Kyle M. Grossman for Plaintiffs and Respondents (No. B331562) and Defendants and Respondents (No. B338936).

_____

**SUMMARY**

These cases, consolidated for purposes of oral argument and decision, concern a law firm's efforts to recover more than $1.7 million in fees and costs for legal services in connection with its representation of then-sheriff Alex Villanueva and the Los Angeles County Sheriff's Department (sheriff's department) in a lawsuit that the County of Los Angeles (county) brought against Villanueva.  (We sometimes refer to the underlying lawsuit as the "Mandoyan matter.")  Because of the county's legal conflict of interest with the sheriff, county counsel by letter advised Villanueva that the Board of Supervisors (board) would provide him with independent legal counsel for the Mandoyan matter.  The same letter also advised Villanueva that he could "select which independent counsel to represent [him] in this matter," but that the board "has discretion to pay such compensation as it deems just and proper for these services," citing Government Code section 31000.

2

Villanueva selected Quinn Emanuel Urquhart & Sullivan (Quinn Emanuel or Quinn). The county filed its lawsuit on March 4, 2019. The firm vigorously litigated on Villanueva's behalf for more than three weeks, at which time Quinn sent Villanueva an engagement agreement which Villanueva signed, and county counsel separately sent Quinn a retainer agreement which Quinn refused to sign. Quinn continued to represent Villanueva until January 2020, and the county paid none of its fees.

Eventually (in October 2021), Quinn Emanuel demanded arbitration at JAMS under the terms of the engagement agreement it had signed with Villanueva. County plaintiffs (the county, the sheriff's department, and Sheriff Villanueva in his official capacity) then filed a complaint for declaratory relief (the county lawsuit). County plaintiffs sought a declaration that there was no valid agreement to arbitrate between Quinn and the county plaintiffs, and that Quinn was precluded by a previous court order from arguing it had a valid contract for its representation of Villanueva. The county also sought an order preliminarily and permanently enjoining the pending arbitration initiated by Quinn.

The county obtained a preliminary injunction enjoining the arbitration and later an order granting summary judgment; Quinn Emanuel then sought leave to file a cross-complaint; the trial court entered judgment; and the court subsequently denied Quinn's motion for leave to file a cross-complaint. Quinn then filed a new complaint for breach of contract, quantum meruit, promissory estoppel and open book account (the same causes of action alleged in its demand for arbitration and in its proposed cross-complaint). The county demurred based on Quinn's alleged

forfeiture of its claims under the compulsory cross-complaint statute and on noncompliance with the Government Claims Act. The trial court sustained the demurrer and dismissed Quinn's complaint with prejudice. Quinn appealed from the judgment in the county's lawsuit, and later appealed from the dismissal of its complaint in Quinn's separate lawsuit. We consolidated the two appeals for oral argument and decision.

The above summary describes these matters only in very broad strokes. The explanatory details follow. The central dispute involves whether or not then-Sheriff Villanueva had the authority to retain – as opposed to select – independent counsel to represent him in the Mandoyan matter.

We conclude the sheriff did not have the authority to retain Quinn Emanuel. Summary judgment for the county plaintiffs in their declaratory relief action was proper; there was no error in the court's denial of Quinn's belated motion for leave to file a cross-complaint in that action; and Quinn's subsequent lawsuit against the county defendants was properly dismissed on demurrer on either of two grounds: because it was a compulsory cross-complaint in the earlier declaratory relief action or because Quinn failed to allege compliance with the presentation requirements of the Government Claims Act.

Accordingly, we affirm both the judgment in the county's action and the order of dismissal in Quinn Emanuel's action.

**FACTUAL AND PROCEDURAL BACKGROUND**

**1.  The Genesis of the Dispute**

The Mandoyan matter is the origin of this dispute, as it created the need for the employment of independent legal counsel for the sheriff. (For convenience, we refer to Villanueva by his name or as the sheriff; a new sheriff took office in December

4

2022.) The facts of the Mandoyan matter are not relevant except for context. In brief, in 2018, before Villanueva was elected, the sheriff's department had terminated Deputy Caren Mandoyan. Mandoyan filed a writ petition and civil complaint against the county. After Villanueva began his term as sheriff on December 3, 2018, he sought to settle Mandoyan's claims, directing the sheriff's department to enter a settlement agreement reinstating Mandoyan with full back pay and benefits. In March 2019, the county filed a writ petition challenging Villanueva's directive as void and illegal because it was not approved by the board or county counsel.

## 2. The Chronology

### a. February 28, 2019

On February 28, 2019, county counsel sent Villanueva a letter (the February 28 letter) notifying him that the board "has agreed to offer you conflict counsel on the question of whether under the Los Angeles County Charter you had the authority to settle the civil actions involving Mr. Mandoyan absent the approval of County Counsel and the Board of Supervisors. [¶] Accordingly, pursuant to California Government Code section 31000.6(a), the Board of Supervisors will provide you with independent legal counsel for [that] sole issue."[1] The letter further advised: "You may select which

---

[1]     Government Code section 31000.6 governs the employment of counsel for the sheriff when county counsel has a conflict of interest. In pertinent part, section 31000.6 states: "Upon request of the [sheriff or other listed officials], the board of supervisors shall contract with and employ legal counsel to assist the . . . sheriff . . . in any case where the county counsel . . . would have a conflict of interest in representing the . . . sheriff." (Gov. Code, § 31000.6, subd. (a).)

5

independent counsel to represent you in this matter. However, please note that the Board of Supervisors has discretion to pay such compensation as it deems just and proper for these services. (Government Code § 31000)."[2] County counsel concluded by stating that if Villanueva had any questions, she "would be happy to discuss further."

### b.    March 2019

The next day, Villanueva contacted Quinn Emanuel, and on March 3, 2019, Quinn agreed to represent Villanueva and the sheriff's department. Also on March 3, the county's outside counsel, Miller Barondess, emailed Villanueva to inform him that the county would sue him and the sheriff's department in the Mandoyan matter the next day, and would seek a temporary restraining order (TRO) the day after that. Shortly after midnight on March 4, 2019, the county filed the lawsuit, along with an application for a TRO.

On March 6, 2019, Quinn Emanuel appeared on behalf of Villanueva and the sheriff's department at the TRO hearing. Quinn filed opposition papers, the matter was vigorously argued, and the county's application for a TRO was denied. County counsel did not object to Quinn's appearance as Villanueva's counsel of record at the hearing, and thereafter counsel for the parties actively litigated the case; the county's lawyers sent all

---

[2]    Section 31000 provides, in part: "The board of supervisors may contract for special services on behalf of the following public entities: the county, any county officer or department, or any district or court in the county. . . . The board may pay from any available funds such compensation as it deems proper for these special services." (Gov. Code, § 31000.) Special services include legal matters. (*Ibid.*)

6

correspondence and papers served to Quinn, and raised no objection to Quinn's representation of Villanueva and the sheriff's department.

On March 28, 2019, Quinn Emanuel emailed Villanueva an engagement letter for its representation of the sheriff and the sheriff's department in the Mandoyan matter. The terms included billing rates ranging from $695 to $1,400 an hour, and an arbitration clause. (The county says that at the time county counsel and the board did not know about Quinn's engagement letter, and the letter does not show copies were sent to anyone but the sheriff.)

The next day, March 29, 2019, county counsel (Thomas Faughnan, senior assistant county counsel) emailed a 14-page letter, captioned "retainer agreement," to Quinn Emanuel. The letter's second paragraph began with the statement, "As you know, you were retained under Government Code section 31000.6(a), which authorizes the Board of Supervisors to employ legal counsel to assist the Sheriff in any case where the County Counsel would have a conflict of interest." The letter continued by stating that Quinn Emanuel's representation was limited to the scope of the Mandoyan matter, and that "it is the Board of Supervisors who determines 'the appropriate hourly rate or other fee structure for the employment of outside counsel selected by the sheriff' " (citing Government Code section 31000 and quoting from an opinion of the Attorney General). The terms included a blended rate for attorneys of $495, as well as "standard billing requirements and terms and conditions [the county] requires of all contracted law firms." Quinn was asked to review, sign and return a copy of the letter accepting its terms, after which Quinn "may remit invoices for payment in accord with these terms."

7

Invoices were to be submitted to Mr. Faughnan, who would review and submit them for payment.

### c. April 2019 – January 2020

Four days later, on April 2, 2019, Villanueva signed the engagement letter Quinn Emanuel had sent to him on March 28, 2019, without providing a copy to the county or obtaining approval from county counsel.

Quinn Emanuel did not acknowledge receipt of the county's proposed retainer agreement, and on April 8, 2019, county counsel sent a follow-up email. Quinn inquired about the terms of the board's engagement of Miller Barondess on the Mandoyan matter. On April 9, county counsel declined to provide information on the fees approved for Miller Barondess and reiterated the "need to have the retainer agreement executed in order to be able to pay your firm." County counsel sent still another email on April 16, 2019, again stating the county "will not pay your firm for services rendered prior to execution of the retainer agreement." Quinn rejected the terms in county counsel's March 29 retainer agreement. Quinn's refusal, in an April 16, 2019 email, stated Quinn had a signed engagement agreement with Villanueva and the sheriff's department; county counsel was conflicted and should have no involvement whatsoever; and Quinn would provide its invoices to Villanueva who was expected to forward them for payment, redacted as appropriate, to the auditor/controller.

On May 31, 2019, O'Melveny & Myers (O'Melveny), representing the county, wrote to Quinn Emanuel. Among other points, the letter stated that neither the sheriff nor the sheriff's department had lawful authority to enter into contracts for legal services, and only the board of supervisors had authority,

8

delegated to county counsel, not the sheriff or the sheriff's department, to determine reasonable rates for conflict counsel services. The letter stated that any engagement agreement between Quinn and the sheriff and sheriff's department was "void, invalid, and unenforceable;" and Quinn was required to execute the retainer agreement previously provided in order to be paid for its representation of the sheriff. O'Melveny and Quinn had several telephonic discussions that included the hourly rate Quinn was charging the sheriff and sheriff's department; Quinn again asked for disclosure of the hourly rates the county agreed to pay its outside law firms in the Mandoyan matter, but O'Melveny refused on the basis the information was privileged and confidential.

On June 20, 2019, Quinn Emanuel filed an ex parte application under Government Code section 31000.6 seeking a declaration that a conflict existed between the Board and the sheriff's department and that Quinn be confirmed as counsel. Section 31000.6 contains provisions authorizing ex parte proceedings before the presiding judge of the superior court if there is a dispute over whether a conflict exists, and there are circumstances under which the presiding judge is authorized to select conflict counsel. (See Gov. Code, § 31000.6, subds. (b)-(e).)

On July 9, 2019, the presiding judge declined to grant the ex parte application, because section 31000.6 did not authorize the presiding judge to find a conflict between the board and the sheriff's department (§ 31000.6 applies to the sheriff, not the sheriff's department); nor was the court authorized under the terms of the statute to confirm the sheriff's selection of Quinn Emanuel.

9

At the July 9, 2019 hearing, the county's outside counsel, O'Melveny & Myers, represented to the court that Quinn Emanuel could be paid for work performed prior to the execution of a contract between Quinn and the county, provided Quinn complied with the county's billing guidelines. Two days later, on July 11, 2019, Louis Miller of Miller Barondess wrote to Quinn, again proffering the county's retainer agreement for signature, and advising that the hourly rates in it were the same as for Miller Barondess.

On August 23, 2019, the county filed an ex parte application, also under Government Code section 31000.6, asking the Presiding Judge to remove Quinn as counsel of record in the Mandoyan matter.

On September 19, 2019, Presiding Judge Kevin C. Brazile denied the application, finding there was no authority under section 31000.6 to resolve the issues raised in the application "under the expedited ex parte procedures permitted under section 31000.6"; a petition for writ of mandate was required. Before making that ruling, the court made several observations, including the following.

"[T]here does not appear to be a permissible mode for Quinn Emanuel to be paid by the County or with County funds for representation of the Sheriff unless and until the County Board of Supervisors employs counsel to assist the Sheriff as provided in Government Code section 31000.6 or the Court finds that the Board has wrongfully failed to perform that duty." No such motion was before the court, "and it appears that the Board is proceeding reasonably under section 31000.6."

"[U]nder any contract to employ counsel to represent the Sheriff pursuant to section 31000.6, there needs to be a means by

10

which the requests for compensation may be evaluated and determined to be or not to be in compliance with the contract. Here, there is no contract between the Board and Quinn Emanuel to represent the Sheriff, and until this occurs, Quinn Emanuel cannot be paid with County funds for its representation of the Sheriff. The determination of the hourly rates to be paid to counsel for the Sheriff appears to at least initially to be up to the County. If the Sheriff contends that the determination of the hourly rate is unreasonable, then he needs to bring an appropriate action to seek relief, which is currently not before this Court." (Fn. omitted.) The court acknowledged the board's duty to employ conflict counsel, which "appears to require a contract and it does not appear that there is a dispute here as to any specific terms, except for the rate, the scope of representation and who reviews the bills."

At the September 19, 2019 hearing, there was also some discussion of an invoice from Quinn Emanuel for $280,000-plus for their services in March and April 2019. That invoice had been approved by the sheriff's department and sent to the auditor-controller, but the auditor-controller cancelled payment after receiving instructions to do so. At the hearing, Steve Madison of Quinn Emanuel stated, with respect to the interception of that check, that "basically now we have a perfected claim under the February 28 letter to bring our lawsuit against the county and the board."

In January 2020, Quinn Emanuel substituted out of the Mandoyan case. (On February 19, 2020, Quinn Emanuel sent the sheriff an invoice for services in the Mandoyan matter in the total amount of $1,740,001.70. This invoice does not appear in the record of the county's lawsuit against Quinn.)

11

The county made no payments to Quinn Emanuel.

**d.        December 2020 – October 2021**

Almost a year later, on December 18, 2020 and January 5, 2021, Quinn Emanuel sent county counsel (Mr. Faughnan) an overview of the work it performed for Sheriff Villanueva, along with invoices.

On January 11, 2021, O'Melveny responded, stating the county could not approve invoices under a void agreement which the county had notified Quinn Emanuel was void in March 2019, and which would require payment well in excess of county rates.

In March 2021, Quinn Emanuel sent the sheriff's department a "Mandatory State Bar Approved Form" entitled "Notice of Client's Right To Fee Arbitration." The notice stated that "[y]ou have an outstanding balance for fees and/or costs for professional services in the amount of $1,740,001.70 charged to you in [the Mandoyan matter]," and that the department had the right under section 6200 of the Business and Professions Code to request arbitration through a bar association program created solely to resolve fee disputes. (This program is mandatory for an attorney if requested by a client and voluntary for a client. (Bus & Prof. Code, § 6200, subd. (c).)) The notice identified a local arbitration program that was available. Quinn sent identical notices to the sheriff and the county. The notices also stated that "[n]o lawsuit or arbitration proceeding has yet been filed but may be filed if we do not resolve this claim."

On April 15, 2021, O'Melveny responded with a letter reiterating that Quinn Emanuel had never executed a valid and enforceable engagement agreement with county counsel. Quinn did not respond to O'Melveny's letter.

On October 29, 2021, Quinn Emanuel served the county, the sheriff and the sheriff's department with a demand for arbitration at JAMS, based on arbitration provisions in the engagement agreement previously executed by Villanueva.

### 3. The County's Lawsuit

Seventeen days later, on November 16, 2021, the county plaintiffs (the county, the sheriff's department, and Villanueva in his official capacity), represented by O'Melveny and Myers, filed a complaint for declaratory relief. They sought a declaration that there was no valid agreement to arbitrate and that Quinn Emanuel was precluded by the presiding judge's September 19, 2019 order from arguing it has a valid contract with any county plaintiff for its representation of the sheriff. County plaintiffs also sought an order preliminarily and permanently enjoining the pending arbitration and requiring Quinn to withdraw the arbitration demand.

On February 28, 2022, the trial court (Judge Holly J. Fujie) granted the county plaintiffs' motion for a preliminary injunction. The court found county plaintiffs were "likely to prevail on their claim that the Fee Agreement is void because Sheriff Villanueva lacked statutory authority to enter into it." The court found there was no delegation of authority to the sheriff to enter into the engagement agreement, so it was likely the agreement was void and unenforceable. The court found plaintiffs' arguments on irreparable harm persuasive, and observed that Quinn Emanuel "was informed by [Presiding] Judge Brazile of the necessary and proper procedures to ensure its entitlement to compensation for the legal services it provided in the Mandoyan matter."

The county plaintiffs later moved for summary judgment, and on April 28, 2023, Judge Fujie granted the motion. The court

13

found no triable issues of fact; the county "did not enter into a fee agreement with [Quinn Emanuel] and . . . the Sheriff lacked the authority to enter into the Agreement." The court ordered plaintiffs to submit a form of judgment.

At the end of the April 28 summary judgment hearing, after the court stated its intention to grant the county plaintiffs' motion, Quinn Emanuel stated it would "seek leave to file a cross-claim for, for example, quantum meruit and the other noncontractual claims that are in our arbitration position," and "we think that's the most efficient way to proceed from this point given the court's ruling on the contract."[3] The court responded that "I'm not sure that's true, but you can certainly file a motion if you wish to file a motion."

On May 8, 2023, Quinn Emanuel filed a motion for leave to file a cross-complaint, contending leave should be granted to avoid forfeiture of "compulsory cross-claims." The proposed cross-complaint alleged causes of action for breach of contract, quantum meruit, promissory estoppel and open book account. On the same date, Quinn filed objections to plaintiffs' proposed judgment. One of its objections was that a final judgment was premature given Quinn's pending motion for leave to file a cross-complaint.

---

[3] The appellate briefs use the terms "cross-complaint," "cross-claim" and "counterclaim" somewhat interchangeably. Without correcting the use of "cross-claim" or "counterclaim" when we are quoting a third person or a brief, we choose to use "cross-complaint" as established in Code of Civil Procedure section 428.10. (See Code Civ. Proc., § 428.80 ["The counterclaim is abolished. Any cause of action that formerly was asserted by a counterclaim shall be asserted by a cross-complaint."]

14

On May 16, 2023, the court entered judgment for the county plaintiffs and against Quinn Emanuel as to all causes of action contained in the county's complaint, permanently enjoining the arbitration and ordering Quinn to withdraw its demand. The judgment states at the top of the page: "(Objections read)." Notice of entry of judgment was served the same day.

On June 29, 2023, some six weeks after judgment had been entered, county plaintiffs filed their opposition to Quinn Emanuel's motion for leave to file a cross-complaint. Quinn filed its reply on July 6, and the court held a hearing on July 13, 2023, taking the matter under submission after hearing argument.

On July 18, 2023, the trial court denied Quinn Emanuel's motion. The court first noted (on a point not discussed by the parties in their motion or opposition papers) that it appeared Quinn would not forfeit its right to file a separate lawsuit if its motion were denied, because the rule governing compulsory cross-complaints does not apply "where the only relief sought is a declaration of the rights and duties of the respective parties in an action for declaratory relief." (Code Civ. Proc., § 426.60, subd. (c).)

The court then ruled that even if the proposed cross-complaint was compulsory, the court had grounds to deny the motion. The court found the language of Code of Civil Procedure section 426.50, governing applications for leave to file a cross-complaint, does not permit the filing of a cross-complaint after final judgment has been entered on the underlying complaint (citing *City of Hanford v. Superior Court* (1989) 208 Cal.App.3d

15

580), and the statute refers to the time of the filing of the cross-complaint, not to the time of the filing of the motion.[4]

Further, the trial court concluded that, while a court must grant leave to file a cross-complaint "if the party who failed to plead the cause acted in good faith" (Code Civ. Proc., § 426.50), grounds existed here for a finding of bad faith. The court found that Quinn Emanuel "acted consciously not to pursue these claims or to otherwise act in a manner that would have preserved its rights prior to the entry of judgment," and that "to the extent there is any potential forfeiture it was [Quinn's] deliberate decision that caused it." The court pointed out that the arbitration proceedings had been enjoined since February 28, 2022; Quinn Emanuel "has manifested its intention to file a cross-complaint for more than one year";[5] and while it filed its

---

[4] Section 426.50 provides: "A party who fails to plead a cause of action subject to the requirements of this article [on compulsory cross-complaints], whether through oversight, inadvertence, mistake, neglect, or other cause, may apply to the court for leave . . . to file a cross-complaint, to assert such cause at any time during the course of the action. The court . . . shall grant . . . leave . . . to file the cross-complaint, to assert such cause if the party who failed to plead the cause acted in good faith. This subdivision shall be liberally construed to avoid forfeiture of causes of action." (Code Civ. Proc., § 426.50.)

[5] In a March 2, 2022 case management statement, Quinn Emanuel stated the court had granted the preliminary injunction and "[a]ccordingly, Quinn Emanuel intends to file a cross-complaint in this case to recover its unpaid legal fees." On March 23, 2022, Quinn Emanuel sent the county's outside counsel its proposed cross-complaint and asked whether the county would stipulate to its filing. The county refused to stipulate, stating the proposed cross-complaint was untimely; was subject to demurrer

16

motion before judgment was entered, "it did not attempt to delay entry of the judgment or to set aside the judgment or to . . . seek ex parte relief to have the Motion resolved before entry of judgment." The court concluded that granting the motion "would require the striking of an entered judgment on the Court's own motion, which this Court declines to do."

On July 17, 2023 (the day before the court's denial of its motion to file a cross-complaint), Quinn Emanuel filed a timely notice of appeal from the May 16, 2023 judgment.

### 4.    Quinn Emanuel's Lawsuit

On August 10, 2023, Quinn Emanuel filed a new lawsuit against the county, the sheriff's department, and Villanueva in his official capacity (the Quinn lawsuit). The complaint alleged the same causes of action as Quinn had alleged in the arbitration and in its proposed cross-complaint in the county's declaratory relief action.

The county defendants demurred, contending each cause of action was barred by the Government Claims Act, forfeited under the "compulsory counterclaim" statute, and unsupported by sufficient facts to state a valid claim as a matter of law.

On February 16, 2024, the trial court (Judge Jon R. Takasugi) sustained the county defendants' demurrer without leave to amend.

---

because it did not plead that a claim was presented to the county under the Government Claims Act; and Quinn Emanuel could not pursue the same relief simultaneously in two venues. Quinn Emanuel did nothing further to pursue its cross-complaint until summary judgment was granted against it over a year later in May 2023.

First, the court concluded Quinn Emanuel "has not alleged any facts which could show compliance with the Government Claims Act's requirement that claims against a public entity be presented in a timely manner and in accordance with specific procedures before any lawsuit is filed."

Second, Quinn Emanuel's claims were barred by California's compulsory cross-complaint statute, as they raised the same threshold legal issue as in the county's complaint for declaratory judgment: "whether the purported retainer agreement between Quinn Emanuel and Villanueva was a valid contract." The court continued: "Indeed, Judge Fujie already ruled on that question in the declaratory judgment action, finding that the purported retainer agreement was invalid and could not bind the County Defendants. As such, to allow this claim to go forward here would not only lead to an unnecessary 'duplication of time and effort,' but could also lead to conflicting rulings." The court observed that its conclusion was "reinforced" by the fact that Judge Fujie denied Quinn leave to file a cross-complaint after concluding Quinn "had acted intentionally and in bad faith in its delay to move for such leave."

Judge Takasugi rejected Quinn Emanuel's contention that its claims were not compulsory under Code of Civil Procedure section 426.60, subdivision (c) [claims are not compulsory "where the only relief sought is a declaration of the rights and duties of the respective parties in an action for declaratory relief"]. The court concluded that "[h]ere, on its face, [the county's] complaint sought additional relief, including an order preliminarily and permanently enjoining the pending arbitration, as well as [] costs of suit."

18

On March 20, 2024, the court entered an order sustaining county defendants' demurrer and dismissing the complaint with prejudice. Quinn Emanuel filed a timely notice of appeal.

On October 11, 2024, after considering a joint motion from the parties, we ordered the appeals consolidated for purposes of oral argument and decision only. We grant the four unopposed requests for judicial notice (RJNs) listed in the margin.[6]

## DISCUSSION

We affirm both the judgment in the county's lawsuit and the order dismissing with prejudice the Quinn lawsuit. Our review of a grant of summary judgment is de novo (*Bailey v. San Francisco District Attorney's Office* (2024) 16 Cal.5th 611, 620), as is our review of an order sustaining a demurrer (*Association for Los Angeles Deputy Sheriffs v. County of Los Angeles* (2021) 60 Cal.App.5th 327, 334).

We discuss Quinn Emanuel's appellate claims in the sequence Quinn presents them.

### 1. The County's Lawsuit: Summary Judgment

Quinn Emanuel contends there are triable issues of material fact concerning the sheriff's authority to execute the

---

[6] These requests are: (1) the county's June 17, 2024 RJN (in B331562) of a July 2019 report by the county Office of the Inspector General; and the complaint, court orders and notice of appeal in the Quinn lawsuit; (2) Quinn Emanuel's September 3, 2024 RJN (in B331562) of a declaration their counsel filed in the Quinn lawsuit; (3) Quinn Emanuel's January 10, 2025 RJN (in B338936) of Quinn's objections to the county's proposed judgment in the county's lawsuit against Quinn; and (4) the county's March 12, 2025 RJN (in B338936) of the Inspector General's July 2019 report; and various declarations, exhibits and briefs filed in the county's lawsuit against Quinn Emanuel.

Quinn engagement agreement on behalf of the Board of Supervisors.  We think not.

Quinn Emanuel correctly points out that the county may exercise its powers "only through the board of supervisors or through agents and officers acting under authority of the board or authority conferred by law" (Gov. Code, § 23005), and that the board "shall contract with and employ legal counsel to assist the . . . sheriff . . . in any case where the county counsel . . . would have a conflict of interest in representing the . . . sheriff." (*Id.*, § 31000.6, subd. (a).)  So far, so good.  Then Quinn cites general principles of agency law, including ostensible authority principles.  (See Civ. Code, § 2317 ["Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to possess."].)  Quinn cites several cases for the proposition that whether an agent has ostensible authority is a question of fact that should not be decided on summary judgment, and concludes "[t]hus," a triable issue existed as to whether the board authorized the sheriff to contract for conflict counsel "in the extraordinary circumstances present in the *Mandoyan* Matter."

Notably, none of the cases Quinn Emanuel cites involves a public entity.  Nor does Quinn acknowledge, either in its opening brief or its reply brief, the principles that do apply.  " 'A contract entered into by a local government without legal authority is "wholly void," ultra vires, and unenforceable.' " (*G.L. Mezzetta, Inc. v. City of American Canyon* (2000) 78 Cal.App.4th 1087, 1092 (*G.L. Mezzetta*).)  And, "[p]ersons dealing with a public agency are presumed to know the law with respect to any agency's authority to contract." (*Katsura v. City of San Buenaventura* (2007) 155 Cal.App.4th 104, 109 [" ' "One who deals with the public officer

20

stands presumptively charged with a full knowledge of that officer's powers, and is bound at his . . . peril to ascertain the extent of his . . . powers  to bind the government for which he . . . is an officer" ' "].)

Certainly the board may delegate its authority to an agent, and it did so; the board expressly delegated its authority "solely" to county counsel.  Board Policy No. 20.170, Contracts for Legal Services, specifies:  "County Counsel is solely authorized to contract for legal services provided to the County, its elected officials, agents, and employees.  The County Counsel, until otherwise ordered, pursuant to Sections 23005 and 31000 of the Government Code and within budgeted appropriation authority, is authorized to approve contracts for legal services."  (Los Angeles County – Board of Supervisors Policy Manual, ch. 20 (Delegated Authorities), 20.170 Contracts for Legal Services (effective July 15, 1987).)  Quinn identifies no other delegation of the board's authority.  (See *Schecter v. County of Los Angeles* (1968) 258 Cal.App.2d 391, 396 ["The general rule . . . is that a delegated power, when made subject to the delegatee's judgment or discretion, is purely personal and may not be further delegated in the absence of express statutory authorization."].)

Quinn Emanuel nonetheless insists there are triable issues concerning the sheriff's authority, and contends the trial court "improperly weighed evidence and failed to draw reasonable inferences" in favor of Quinn as the nonmoving party.  We see no such flaws in the trial court's ruling.

Quinn relies on the February 28 letter from county counsel to the sheriff, but fails to come to grips with its express language.  Instead, Quinn complains that the letter provided no guidance on the amount of compensation deemed "just and proper"; the board

21

did not help the sheriff identify counsel, or recommend counsel to him, or "follow up after sending the February 28 letter"; and did not object to Quinn's representation, or insist (until March 29) that an agreement with the county was required for Quinn to be paid. None of this casts any doubt on the conclusion that the sheriff had no authority to enter into the Quinn Emanuel engagement agreement.

We have quoted the language of the February 28 letter (pp. 5-6, *ante*). The letter identified the Government Code provisions under which the county was acting, and those provisions are clear that only the board may contract with conflict counsel. (E.g., "the board of supervisors shall contract with and employ legal counsel to assist the . . . sheriff . . . .") The February 28 letter was equally clear that it is the board who determines "just and proper" compensation. At the risk of repetition: "You may select which independent counsel to represent you in this matter. *However, please note that the Board of Supervisors has discretion to pay such compensation as it deems just and proper for these services. (Government Code § 31000)."* (Italics added.) We see nothing in the February 28 letter that may be construed to authorize the sheriff to contract with counsel on the terms of his representation.

Quinn Emanuel points to the proposed retainer agreement that county counsel sent to Quinn Emanuel on March 29. The agreement included an introductory statement that, "[a]s you know, you were retained under Government Code section 31000.6(a), which authorizes the Board of Supervisors to employ legal counsel . . . ." Quinn contends use of the word "retained" was an acknowledgment of the sheriff's authority, raising a factual dispute on the point. We do not agree. As the trial court

22

pointed out, Quinn presented "no evidence that [] the County ever used the term 'retained' in a manner that may reasonably imply that it ratified the terms of the Agreement between Villanueva and [Quinn]." Quite the contrary. The entirety of the county's March 29 proposed retainer agreement makes that clear, and other facts, such as the sheriff's signing the Quinn Emanuel agreement several days after the county sent its proposed retainer agreement to Quinn, as well as the county's consistent assertions thereafter that Quinn had not entered into a valid fee agreement, merely reinforce that conclusion. (See also *G.L. Mezzetta, supra,* 78 Cal.App.4th at p. 1094 ["with respect to . . . claims of estoppel and ratification, neither doctrine may be invoked to enforce a void contract"].)

Quinn Emanuel criticizes the trial court for stating (in its recitation of the county's evidence) that the sheriff signed the Quinn engagement agreement "without providing a copy of the Agreement to the County or obtaining approval from County Counsel." Quinn claims this is a disputed material fact, because the February 28 letter did not require the sheriff to do so, "and reading such a requirement into the letter impermissibly draws an inference in favor of the moving party." The trial court did not read anything into the February 28 letter; it merely recited a fact, which is undisputed because Quinn cited no evidence to the contrary.

In the end, the only evidence Quinn Emanuel provided to support its position is the February 28 letter – the terms of which are not helpful to Quinn – and the county's failure to object to its representation of the sheriff during the TRO hearing and the three succeeding weeks. (Notably, Quinn did not manage to send its engagement letter to the sheriff during those three weeks

23

either.)  In any event, Quinn's repetitive recitations of these same points, and its contorted assertions that the trial court improperly weighed evidence, all boil down to the conclusory argument that under "the extraordinary circumstances," it is reasonable to infer that the February 28 letter authorized the sheriff to retain and set attorney fees for independent counsel, and the court "fail[ed] to grant that reasonable inference in favor of Quinn Emanuel."  Neither the law nor the evidence supports that claim.  Summary judgment was proper.

2.     **The County's Lawsuit:  The Motion for Leave To File a Cross-complaint**

Quinn Emanuel contends the trial court erred in denying its motion for leave to file a cross-complaint, because (1) the cross-complaint was compulsory; (2) Quinn filed its motion "during the course of the action," thus requiring the court to grant leave to file the cross-complaint (see Code Civ. Proc., § 426.50); and (3) there was no substantial evidence Quinn's delay in seeking leave to file constituted bad faith (which would justify denial of the motion).  We agree with Quinn's first point – that its cross-complaint was compulsory – but disagree with the other two points, either one of which justifies the trial court's denial of Quinn's motion for leave to file its cross-complaint.[7]

---

[7]     The county in its "statement of appealability" argues at length that we should not decide this issue because Quinn Emanuel's notice of appeal "does not encompass the denial of Quinn's motion for leave to file its cross-complaint."  The county contends the denial "was a post-judgment order" and Quinn was required to file a separate notice of appeal, which it did not do.  (Quinn does not respond to this argument in its reply brief.)  To recap the chronology, Quinn filed its motion for leave to file a cross-complaint on May 8, 2023; and the judgment was entered

### a.  The cross-complaint was compulsory

The proposed cross complaint was compulsory.  It included causes of action for breach of contract, quantum meruit, promissory estoppel and open book account, all arising out of the county's refusal to pay Quinn Emanuel for legal services rendered to the sheriff in the Mandoyan matter.  These are " '[r]elated cause[s] of action' " within the meaning of Code of Civil Procedure section 426.10, subdivision (c) [" 'Related cause of action' means a cause of action which arises out of the same transaction, occurrence, or series of transactions or occurrences as the cause of action which the plaintiff alleges in his complaint."]  Section 426.30 specifies that "if a party against whom a complaint has been filed and served fails to allege in a cross-complaint any related cause of action which (at the time of serving his answer to the complaint) he has against the plaintiff, such party may not thereafter in any other action assert against the plaintiff the related cause of action not pleaded."  (Code Civ. Proc., § 426.30, subd. (a).)

---

(and notice of entry served) on May 16, 2023.  On July 13, 2023, the trial court heard argument and took Quinn's motion for leave to file a cross-complaint under submission.  On July 17, 2023 (apparently the last day to appeal), Quinn filed its appeal from the judgment.  The next day, July 18, 2023, the court denied Quinn's motion (which it had taken under submission a few days earlier).  While the denial order was chronologically an order made after an appealable judgment, it related to a motion filed before judgment was entered, rather than to ordinary post-judgment proceedings.  Under these circumstances, we will consider the denial order to have been subsumed in the judgment from which Quinn appealed on the preceding day.

There is an exception where in the complaint "the only relief sought is a declaration of the rights and duties of the respective parties in an action for declaratory relief." (Code Civ. Proc., § 426.60, subd. (c).) That exception does not apply to the county's complaint for declaratory relief, because the county sought more than a declaration; the county sought and obtained a preliminary and then a permanent injunction against Quinn Emanuel's attempts to arbitrate its claims against the county. (See *AEG Holdco LLC v. Vazquez* (C.D.Cal. Sept. 22, 2021, No. 2:21-cv-05290-VAP (AGRx)) 2021 U.S.Dist.Lexis 203268, pp. *28-29 [claims were not exempt from California's compulsory cross-complaint statute where the complaint also sought injunctive relief].) The cross-complaint was compulsory.

### b. The cross-complaint was not filed "during the course of the action"

A party who fails to plead a cause of action subject to the compulsory cross complaint statute, "whether through oversight, inadvertence, mistake, neglect, or other cause, may apply to the court for leave . . . to file a cross-complaint, to assert such cause at any time during *the course of the action.* The court . . . shall grant . . . leave . . . to file the cross-complaint, to assert such cause if the party who failed to plead the cause acted in good faith. This subdivision shall be liberally construed to avoid forfeiture of causes of action." (Code Civ. Proc., § 426.50; italics added.) Even where the motion "is made on the eve of trial," a trial court errs in denying the motion if there is "no substantial evidence to support a finding that [defendants] were acting in bad faith." (*Silver Organizations Ltd. v. Frank* (1990) 217 Cal.App.3d 94, 97 (*Silver Organizations*).)

26

Here, the cross-complaint itself was *not* filed "during the course of the action." And Quinn Emanuel's motion for leave to file was not filed "on the eve of trial" either; the motion was not filed until after the "trial" – here, the summary judgment hearing – had already been held and the motion granted, that is, until after Quinn had already lost the case on summary judgment.

In short, Quinn Emanuel deliberately delayed filing its motion until after it lost the case. By that time, it was far too late for a motion to be heard before entry of judgment in normal course. We decline to construe the term "during the course of the action" to include a period *after* the merits of the plaintiffs' underlying complaint have already been decided. Moreover, as the trial court pointed out, Quinn made no attempt "to delay entry of the judgment or to set aside the judgment or to seek ex parte relief to have the Motion resolved before entry of judgment." As a consequence, no cross-complaint was on file when judgment was entered. (See *City of Hanford v. Superior Court, supra,* 208 Cal.App.3d at p. 586, italics omitted ["A party cannot file a cross-complaint after judgment has been entered on the underlying complaint in the trial court."].)

Quinn Emanuel argues that our conclusion is "inconsistent" with the statute's directive that section 426.50 is to be "liberally construed to avoid forfeiture of causes of action" (Code Civ. Proc., § 426.50), and contends that "[a] liberal construction of the phrase 'during the course of the action' reasonably includes the period when motions filed pre-judgment are still pending before the Court and no appeal has been filed." Quinn cites no authority for this proposition, and we decline to endorse the notion that such a construction – allowing a motion after the merits of the underlying complaint have already been decided – would be

27

"reasonabl[e]." Quinn had plenty of time to file its motion in the many months between the time the arbitration was preliminarily enjoined and summary judgment was granted. The record contains several references to Quinn Emanual's intent to file a cross complaint during this time. (See pages 16-17, and fn. 5, *ante.*) As the trial court stated, "to the extent there is any potential forfeiture it was [Quinn's] deliberate decision that caused it."

Quinn Emanuel next tells us that courts have inherent power to correct their own judgments for clerical errors at any time. So they do, but Quinn fails to identify any "clerical error." Then Quinn tells us that the trial court's May 16, 2023 judgment "was not final," citing *Roy Brothers Drilling Co. v. Jones* (1981) 123 Cal.App.3d 175. *Roy Brothers* ruled that a judgment "was premature and in violation of the one-judgment rule" where a cross-complaint "remained pending and at issue." (*Id.* at p. 180; see *id.* at p. 179 [cross-complaint was filed before the trial court granted summary judgment on the underlying complaint].) Quinn also cites *Baker v. Castaldi* (2015) 235 Cal.App.4th 218, 223 [a purported judgment was interlocutory where it stated that the plaintiff was entitled to punitive damages in an amount to be decided at a separate trial]. We fail to see how either *Roy Brothers* or *Baker* has any relevance to this case.

In sum, Quinn Emanuel deliberately did not file its motion for leave to file a cross-complaint until after the merits of the underlying complaint were decided against it, as a consequence of which its cross-complaint was not filed "during the course of the action" within the meaning of Code of Civil Procedure section 426.50. On that basis alone, there was no error in the trial court's denial of the motion.

### c. The bad faith issue

As an alternative analysis, we also find no error in the trial court's conclusion that, "in the context of this litigation," Quinn Emanuel's delay in seeking to file the cross-complaint was evidence of bad faith. (Code Civ. Proc., § 426.50 [court "shall grant" leave to file the cross-complaint "if the party who failed to plead the cause acted in good faith"].)

Both parties discuss the same two cases on the bad faith issue. The county emphasizes *Gherman v. Colburn* (1977) 72 Cal.App.3d 544, 559 (*Gherman*), where the court held the statutory terminology "allows the court some modicum of discretion in determining whether or not a defendant has acted in good faith." *Gherman* stated that "[w]here the defendant fails to act for a period of over 30 days and waits until the first day of trial, such conduct may be interpreted as evidence of a lack of good faith *especially* when coupled with the long history of litigation between the parties, which demonstrates that both sides were jockeying for position over the right to a jury trial." (*Ibid.*) *Gherman* held: "Since as an appellate court, we are required to indulge in presumptions in favor of the regularity of the rulings of the trial court, we conclude that the trial court impliedly found and concluded that by attempting to file a cross-complaint on the first day of trial, defendants were not acting in 'good faith' but that the motion for leave to file a cross-complaint was merely a tactical, strategic maneuver to deprive plaintiffs of a right to a jury trial. In our view such an implied finding satisfied the requirements of Code of Civil Procedure section 426.50." (*Id.* at p. 560.)

Quinn Emanuel, on the other hand, relies on *Silver Organizations, supra,* 217 Cal.App.3d at p. 98, where the court

29

"reject[ed] the view that the trial court may 'exercise discretion' in the denial of a motion to file a compulsory cross-complaint under section 426.50," and instead held the trial court erred in denying the motion "because there was no substantial evidence to support a finding that [the defendants] were acting in bad faith." (*Id.* at pp. 97-98.)

While the formulations in *Gherman* and *Silver Organizations* are somewhat different, both actually apply the *Silver Organizations* principle. *Silver Organizations* expressly points this out, stating that "[w]hile *Gherman* alludes to a 'modicum of discretion' it seems clear its conclusion is based on a determination that substantial evidence supported the trial court's denial of the motion to file a cross-complaint." (*Silver Organizations, supra,* 217 Cal.App.3d at p. 99.) The court then quotes extensively from *Gherman*'s rationale for finding bad faith, quoted above.) (*Silver Organizations,* at p. 99.)

In *Silver Organizations,* by contrast, the court's review of the entire record "fail[ed] to reveal, directly or inferentially, any substantial evidence of bad faith by the [defendants]." (*Silver Organizations, supra,* 217 Cal.App.3d at p. 100.) In that case, after some difficulties, the defendants obtained new counsel with no previous knowledge of the case. Counsel's "appropriate[] and expeditious[]" investigation and discovery revealed additional grounds for defending his client and for filing a cross-complaint. (*Id.* at pp. 101, 98.) Counsel sought leave to file the cross-complaint a few days before trial (which was set for a date less than six months after the plaintiffs filed their action). (*Id.* at pp. 97-98.) The trial court gave no reason for its denial of the defendants' motion. (*Id.* at p. 100.) The appellate court concluded: "Looking at the entire period between the filing of the

30

complaint and the denial of the section 426.50 motion, a time frame of less than six months, we find nothing in [the defendants'] words or conduct remotely suggesting dishonest purpose, moral obliquity, sinister motive, furtive design or ill will." (*Id.* at p. 100.)

Quinn Emanuel correctly points out that "[f]actors such as oversight, inadvertence, neglect, mistake or other cause, are insufficient grounds to deny the motion unless accompanied by bad faith." (*Silver Organizations, supra,* 217 Cal.App.3d at p. 99.) But the record before the trial court did not show any "oversight, inadvertence, neglect, mistake or other cause" (*ibid.*); it showed Quinn's deliberate delay – not merely of 30 days as in *Gherman* – but of more than a year after Quinn first expressed its intention to file a cross-complaint, and after the merits of the underlying complaint were decided against it.

The trial court explicitly acknowledged the principle stated in *Silver Organizations,* but also cited *Gherman* and concluded that "the court may interpret a party's delay in seeking to file a cross-complaint as evidence of lack of good faith, especially when coupled with a long history of litigation between the parties." The court found that Quinn Emanuel "acted consciously not to pursue these claims or to otherwise act in a manner that would have preserved its rights prior to the entry of judgment."

Quinn Emanuel contends the trial court "identified no dishonest purpose, furtive design, or ill will" in Quinn's conduct, thus suggesting we are restricted to the *Silver Organizations* court's definition of bad faith as "dishonest purpose, moral obliquity, sinister motive, furtive design or ill will." (*Silver Organizations, supra,* 217 Cal.App.3d at p. 100.) We are not. Many definitions of bad faith have been offered where bad

31

faith is not defined in the relevant statute. (See *Bruno v. Hopkins* (2022) 79 Cal.App.5th 801, 823 [citing cases stating, for example, that " ' " ' "bad faith" means simply that the action or tactic is being pursued for an improper motive' " ' " and " ' " 'usually the trial court will be required to infer it from circumstantial evidence' " ' "].) We cannot say it was error for the court to infer an improper purpose in Quinn's deliberate over-a-year-long delay – particularly a delay that extended until after the merits of the underlying complaint were decided against Quinn.

Quinn excuses its deliberate decision not to file its cross-complaint in March 2022 by blaming the county for refusing to stipulate to its filing, stating that "[h]ad the County so stipulated, Quinn Emanuel would have filed the proposed cross-complaint at that time." As the trial court pointed out, the county's refusal to stipulate "did not prevent [Quinn] from filing a motion for leave to file it. Nor did it prevent [Quinn] from filing a separate action at any time on these claims, and then allow the court to determine whether they were compulsory cross-claims or not." We agree.

Quinn Emanuel further asserts it was "under no obligation to pursue its claims in court" while the arbitration was only preliminarily enjoined, and was "still within its rights" to wait until it lost on summary judgment. We cannot agree that Quinn, knowing of its claims for years, was "within its rights" to delay until there was no time left to make a motion in ordinary course, and even then to make no attempt to seek ex parte relief to have the motion decided before entry of judgment or to set aside the judgment. Quinn erroneously asserts that the trial court's criticism of Quinn for failing to try to delay entry of judgment

32

"completely misstates the record." The trial court did not "misstate[] the record," completely or otherwise. Again Quinn excuses its refusal to use available procedures, saying that its objections to the proposed judgment included an objection on the ground a judgment would be premature given its (simultaneously-filed) motion for leave to file a cross-complaint. According to Quinn, the court "impliedly rejected" that argument by entering the judgment, excusing the need for an ex parte application or a motion to vacate the judgment. We disagree with that notion, for which Quinn offers no authority.

In sum, the trial court did not abuse its discretion in denying Quinn Emanuel's motion for leave to file a cross-complaint. This is so whether viewed in the prism of substantial evidence of Quinn's bad faith, or as Quinn's deliberate delay in filing its motion until after the merits of the underlying complaint were decided against it, as a consequence of which its cross-complaint was not filed "during the course of the action" within the meaning of Code of Civil Procedure section 426.50.

3.    **Quinn Emanuel's Lawsuit**

To refresh the reader's memory, after its losses in the county's lawsuit, Quinn Emanuel filed a new lawsuit alleging the same four causes of action it alleged in its attempt to arbitrate at JAMS and in its abortive cross-complaint. The county defendants demurred, contending Quinn's claims were forfeited because they were compulsory cross-complaints in the prior action and because Quinn failed to show compliance with the Government Claims Act. Quinn argued its claims were *not* the subject of a compulsory cross-complaint and its complaint adequately alleged compliance with the Government Claims Act.

33

The trial court (Judge Takasugi) agreed with the county on both points and dismissed Quinn's complaint.

### a.     The Compulsory Cross-Complaint Issue

In its appeals, Quinn Emanuel argues that either Judge Fujie erred when she opined that Quinn's cross-complaint was not compulsory, or Judge Takasugi erred in finding it was compulsory and therefore dismissing Quinn's complaint. We have already concluded that the cross-complaint was compulsory (part 2.a., *ante*), so we necessarily affirm Judge Takasugi's dismissal of Quinn's complaint.  The remainder of Quinn's argument is a repeat of its contention that Judge Fujie erred in denying Quinn's motion for leave to file the cross-complaint – the same argument we have just rejected (parts 2.b. & c., *ante*).

### b.     The Government Claims Act issue

As another ground requiring dismissal of Quinn Emanuel's complaint, the trial court held that the complaint was barred by the Government Claims Act, because Quinn "has not alleged any facts which could show compliance with the Government Claims Act's requirement that claims against a public entity be presented in a timely manner and in accordance with specific procedures before any lawsuit is filed."

This ground for sustaining the county's demurrer was correct as well.

### i.     The statute

All claims for money or damages against local public entities (with inapplicable exceptions) must comply with the claim presentation requirements of the Government Claims Act. (Gov. Code, § 905.)  This is distinct from the applicable statute of limitations for filing a lawsuit based on a government claim.

Claims relating to any cause of action other than for personal injury or property damage must be presented "not later than one year after the accrual of the cause of action."[8] (*Id.*, § 911.2, subd. (a).)

"[N]o suit for money or damages may be brought against a public entity on a cause of action for which a claim is required to be presented . . . until a written claim therefor has been presented to the public entity and has been acted upon by the board, or has been deemed to have been rejected by the board." (Gov. Code, § 945.4.) " ' "Thus, under these statutes, failure to timely present a claim for money or damages to a public entity bars a plaintiff from filing a lawsuit against that entity." ' " (*DiCampli-Mintz v. County of Santa Clara* (2012) 55 Cal.4th 983, 990 (*DiCampli-Mintz*).)

Under Government Code section 915, a claim "shall be presented to a local public entity by any of the following means: [¶] "(1) Delivering it to the clerk, secretary, or auditor thereof. [¶] (2) Mailing it to the clerk, secretary, auditor, or to the governing body at its principal office."[9] (Gov. Code, § 915, subd.

---

[8] The notices that Quinn contends constituted presentation of its claim (see *post*) were sent on March 2, 2021. According to Quinn Emanuel, its claim accrued on March 20, 2020, 30 days after it sent a February 19, 2020 invoice to Sheriff Villanueva for $1,740,001.70. The county disputes this accrual date, contending Quinn's claim accrued no later than September 19, 2019, when Quinn's attorney stated in open court that "now we have a perfected claim under the February 28 letter to bring our lawsuit against the county and the board."

[9] If expressly authorized by ordinance or resolution, electronic submission "to the public entity in the manner

(a).)  In addition, a claim is deemed to have been presented in compliance with section 915, even if not delivered or mailed as provided, "if, within the time prescribed for presentation thereof, . . .  [¶] (1) It is actually received by the clerk, secretary, auditor, or board of the local public entity."  (*Id.*, subd. (e)(1).)

"Even if the public entity has actual knowledge of facts that might support a claim, the claims statutes still must be satisfied. [Citation.]  'The filing of a claim is a condition precedent to the maintenance of any cause of action against the public entity and is therefore an *element* that a plaintiff is required to prove in order to prevail.' "  (*DiCampli-Mintz, supra,* 55 Cal.4th at p. 990.)

### ii.     Quinn Emanuel's complaint and the notices

Quinn's complaint does not allege compliance with the Government Claims Act or its presentation requirement, and indeed does not mention the Act.  This is so despite the fact that when the county refused to stipulate to the filing of Quinn's cross-complaint in the county's lawsuit in March 2022, the county expressly stated as a ground that the cross-complaint was subject to demurrer because it did not plead that a claim was presented to the county under the Government Claims Act.

Quinn Emanuel instead points to paragraph 31 of the complaint, which alleged that "[o]n March 2, 2021, Quinn Emanuel served each of the Defendants with a Notice of Client's Right to Fee Arbitration identifying the outstanding balance for fees and/or costs for professional services charged in the *Mandoyan* matter."

---

specified in the ordinance or resolution" is also permitted. (Gov. Code, § 915, subd. (a)(3).)

36

We have described the notices, which appear on a mandatory state bar form, more fully at page 12, *ante*. These notices of the "client's right to fee arbitration" through a local bar association program were addressed, respectively, to "Alex Villanueva, Los Angeles County Sheriff" and to "Los Angeles County Sheriffs Department" at 211 W. Temple Street, and to "COUNTY OF LOS ANGELES" at 500 W. Temple Street, Los Angeles, CA 90012.

Quinn Emanuel's complaint did not allege how any of the notices were served or upon whom – that is, whether Quinn "[d]eliver[ed] it to the clerk, secretary, or auditor" of the county, or whether Quinn "[m]ail[ed] it to the clerk, secretary, auditor, or to the governing body at its principal office." (Gov. Code, § 915, subds. (a)(1) & (2).) Nor do the fee arbitration notices themselves indicate how they were served or to which statutorily designated recipient they were delivered or mailed. Nor does the complaint allege that the notices were, in any event, "actually received" by the clerk, secretary, auditor, or board "within the time prescribed for presentation thereof." (*Id.*, subd. (e)(1).)

Quinn contends it "at the very least, substantially complied with Government Code sections 910 and 910.2." (These sections specify the necessary contents of a claim (§ 910) and a signature requirement (§ 910.2).)[10] But Quinn says nothing in its opening brief about its compliance with section 915.

---

[10] Among other things, the required contents include "[t]he date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted," and "[t]he name or names of the public employee or employees causing the injury, damage, or loss, if known." (Gov. Code, § 910, subds. (c) & (e).) Section 910 also provides that if the amount claimed exceeds

37

As *DiCampli- Mintz* tells us, "[s]ection 915(a)(1) reflects the Legislature's intent to precisely identify those who may receive claims on behalf of a local public entity. Section 915(e)(1) reflects the Legislature's intent that a misdirected claim will satisfy the presentation requirement if the claim is 'actually received' by a statutorily designated recipient. . . . If an appropriate public employee or board never receives the claim, an undelivered or misdirected claim fails to comply with the statute." (*DiCampli-Mintz, supra,* 55 Cal.4th at p. 992.) Thus, *DiCampli-Mintz* held that where a claim "was never delivered or mailed to the 'clerk, secretary or auditor' as required by section 915(a)" and "the 'clerk, secretary, auditor or board' never actually received the claim," the Court of Appeal erred in holding there was " 'substantial compliance.' " (*Id.* at pp. 991-992.) Quinn Emanuel's complaint is devoid of allegations that any of its notices "of client's right to fee arbitration" were mailed or delivered to or actually received by a statutorily designated recipient.

Moreover, even if one of the notices had been properly directed to a statutorily designated recipient, we fail to see how the county would have recognized that, by sending a state bar form informing the county of its right to fee arbitration by a local bar arbitration program, Quinn was actually trying to satisfy the presentation requirements of the Government Claims Act.

Quinn Emanuel argues that the county did not notify Quinn that its claim, as presented, was insufficient, and therefore waived any defense as to its sufficiency, citing

---

$10,000, "no dollar amount shall be included in the claim. However, it shall indicate whether the claim would be a limited civil case." (*Id.,* subd. (f).)

Government Code sections 910.8 and 911. Those sections apply to the contents of the claim, not to the requirement for presentation to statutorily designated recipients.[11]

Quinn Emanuel then contends that, "[a]t minimum," it should be given leave to amend the complaint to demonstrate compliance with the Act. But Quinn does not tell us what factual allegations it would add to show compliance with Government Code section 915. In its reply brief, Quinn states only that it sent the notice "to the County at its principal office," without explaining how that constitutes delivery or mailing "to the clerk, secretary, auditor, or to the governing body" of the county; or actual receipt of the claim "by the clerk, secretary, auditor, or board" of the county within the time prescribed for presentation.

The parties also dispute at length the question whether, in any event, Quinn Emanuel's complaint was filed "within two years from the accrual of the cause of action," for statute of limitations purposes. (Gov. Code, § 945.6, subd. (a)(2).) We will not wade into this dispute given Quinn's failure to allege compliance with the claim presentation requirements.

---

[11]    Section 910.8 states: "If, in the opinion of the board or the person designated by it, a claim as presented fails to comply substantially with the requirements of Sections 910 and 910.2, . . . the board or the person may, at any time within 20 days after the claim is presented, give written notice of its insufficiency, stating with particularity the defects or omissions therein." (Gov. Code, § 910.8.) Section 911 states: "Any defense as to the sufficiency of the claim *based upon a defect or omission in the claim as presented* is waived by failure to give notice of insufficiency with respect to the defect or omission as provided in Section 910.8." (Gov. Code, § 911, italics added.)

## DISPOSITION

The judgment entered on May 16, 2023 (No. B331562) is affirmed.  The July 18, 2023 order denying Quinn Emanuel's May 8, 2023 motion for leave to file a cross-complaint (No. B331562) is affirmed.  The March 20, 2024 order sustaining county defendants' demurrer and dismissing Quinn Emanuel's complaint with prejudice (No. B338936) is affirmed.  The county plaintiffs in No. B331562 and the county defendants in No. B338936 shall recover costs on appeal.

## CERTIFIED FOR PUBLICATION


RUBIN, J.*


WE CONCUR:



STRATTON, P. J.



WILEY, J.

---

*       Retired Presiding Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.